IN THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY, MARYLAND

| | | |
|---|---|---|
| **ROGER AND DEBRA WILLIAMS** | * | |
| 4047 Ganford Drive | * | |
| Jarrettsville, MD  21084 | * | |
| | * | |
| Plaintiffs | * | |
| | * | |
| **v.** | * | |
| | * | Case No.: _____ |
| **WELLS FARGO BANK, N.A. d/b/a** | * | |
| **WELLS FARGO  HOME** | * | |
| **MORTGAGE** | * | |
| 101 North Phillips Ave. | * | |
| Sioux Falls, SD 57104 | * | |
| | * | |
| Serve On: | * | |
| | * | |
| CSC-Lawyers Incorporating Service | * | |
| Company, Resident Agent | * | |
| 7 ST. Paul Street, Ste. 1660 | * | |
| Baltimore, MD 21202 | * | |
| | * | |
| and | * | |
| | * | |
| **HSBC BANK USA, NATIONAL** | * | |
| **ASSOCIATION as Trustee for** | * | |
| **WELLS FARGO HOME EQUITY** | * | |
| **TRUST 2004-2** | * | |
| 2 Hanson Place, 14th Floor | * | |
| Brooklyn, NY 11217 | * | |
| | * | |
| Serve On: | * | |
| | * | |
| The Corporation Trust Inc. | * | |
| Resident Agent | * | |
| 351 West Camden Street | * | |
| Baltimore, MD 21201 | * | |
| | * | |
| Defendants | * | |
| | * | |

**COMPLAINT &  REQUEST FOR JURY TRIAL**

Plaintiffs Roger and Debra Williams ("Mr. and Mrs. Williams" or "the Williams"), through their undersigned counsel files this Complaint and Request for Jury Trial and say in support:

## I. INTRODUCTION

1.    The underlying matter involves just one thousands of other similar situations across the State where homeowners are (i) seeking to change and modify their current mortgage loans without requesting additional credit, (ii) complying with all requests of their servicer/lender in making the requests, but (iii) all their reasonable steps are ignored in bad faith and the homeowners are left with no other option but to seek the assistance of the Courts.  To add insult to injury, many servicers implemented (iv) bogus signature practices to fast track foreclosures, like the underlying matter, without regard to the integrity of the judicial system and basic due process.

2.    These claims concern the utter failure of Defendant Wells Fargo Bank, N.A. d/b/a Wells Fargo Home Mortgage, Inc. ("Wells Fargo") and its principal, HSBC Bank USA, N.A. ("HSBC"), as Trustee for the registered holders of Wells Fargo Home Equity Trust 2004-2 to comply with Federal and Maryland law related to Mr. and Mrs. Williams's reasonable and appropriate requests to modify their mortgage loan subject to this action without seeking additional credit.  In addition, Wells Fargo and HSBC have failed to comply with their duties under federal and state law governing their safe and sound banking practices including those in which each has entered into consent order/agreements with their regulatory authorities.

3.    Many, but not all, Maryland homeowners facing foreclosure have reasonable and sustainable solutions to their mortgage situation.  Mr. and Mrs. Williams do have a

sustainable solution, yet the Defendants, by and through their authorized agents and employees, are threatening a wrongful foreclosure—otherwise known as an adverse action—on Mr. and Mrs. Williams' home and property without having first even complied with federal or state law or regulations in the first instance.

4.　　　Further, and very significant to Mr. and Mrs. Williams, but for the botched loss mitigation efforts by the Defendants, Mr. and Mrs. Williams have suffered and continue to suffer direct and proximate damages resulting from the unresolved mortgage situation which prevents them from obtaining credit, maintaining their business, and securing assignments that would generate larger income for their business.

5.　　　Further, if the threatened foreclosure sale of Mr. and Mrs. Williams' home and property proceeds, Mr. and Mrs. Williams will sustain significantly greater economic damages and losses as a result through further loss of their home, emotional damages as a result of those proceedings and the Defendants' actions (directly and indirectly through their authorized agents and affiliates).

## II. PARTIES

6.　　　Mr. and Mrs. Williams are residents of the State of Maryland and is the owner of the real property commonly known as 4047 Gansford Court, Jarrettsville, MD 21084 ("the Property").

7.　　　Defendant HSBC as Trustee is the registered holder of Wells Fargo Home Equity Trust 2004-2. Upon information and belief, Wells Fargo Home Equity Trust 2004-2 is organized under the laws of the State of Delaware. Wells Fargo Home Equity Trust 2004-2 also claims to be the owner of the residential mortgage loan subject to this action to which Wells Fargo acts as its authorized servicer on behalf of HSBC.

8.      Defendant Wells Fargo is a national banking association chartered under the laws of the state of South Dakota with its principal place of business in Scottsdale, Arizona. Wells Fargo Home Mortgage Inc. is an operating division of Wells Fargo Bank, N.A. that provides mortgage lending and is located in Des Moines, Iowa. Wells Fargo Bank is wholly responsible for all acts and omissions of Wells Fargo Home Mortgage. Wells Fargo Bank, N.A. and Wells Fargo Home Mortgage Inc. are referred to collectively herein as "Wells Fargo." Wells Fargo services hundreds of mortgages throughout the State of Maryland and Anne Arundel County and owns real property in Anne Arundel County.

9.      In all instances relevant to this matter, Wells Fargo acted as agent for HSBC, Trustee for Wells Fargo Home Equity Trust 2004-2, a real estate investment trust that, on information and belief, is organized under the laws of Delaware. Upon information and belief HSBC owns real property in Anne Arundel County.

10.     Not named as a party to this action the law firm of Covahey Boozer Devan & Dore is a foreclosure law firm. Covahey Boozer Devan & Dore was the authorized agent of Wells Fargo and HSBC for certain foreclosure proceedings described herein.

### III. JURISDICTION & VENUE

11.     This Court has jurisdiction asserted because Defendants transact business and perform work and services in Maryland and each has availed themselves to the jurisdiction of this Court through their appointed agents including Covahey Boozer Devan & Dore, and other foreclosure trustees in this Court.

12.    Declaratory and injunctive relief are available pursuant to Md. Code Ann., §§ 3-401-3-415.

13.    Venue is appropriate in this Court because the Defendants conduct business within the Anne Arundel County, Maryland.

## IV. FACTS

### A.    The Foreclosure Crisis

14.    Over the last four years, Maryland and, indeed, the United States have been in a foreclosure crisis. Recent news reports have established that one in ten American homes is at risk of foreclosure.

15.    The number of Maryland properties with foreclosure filings has increased substantially throughout the last four years.

16.    Increased foreclosures have a detrimental effect not just on the borrowers who lose unique property and face homelessness, but also on the homes surrounding a foreclosure and, perhaps, neighborhoods that suffer decreased property values and municipalities that lose tax revenue.

17.    The foreclosure crisis is far from over. Economists predict that interest rate resets on the riskiest of lending products will not reach their zenith. *See* Eric Tymoigne, Securitization, Deregulation, Economic Stability, and Financial Crisis, Working Paper No. 573.2 at 9, Figure 30 *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1458413 (citing a Credit Suisse study showing monthly mortgage rate resets).

18.     Since the commencement of the crisis, revelations of bogus, false, and deceptive "robo signing" have come to light involving national lenders and mortgage servicers. In Maryland the illegal "robo-signing" issue has even come to the forefront because attorneys and substitute trustees, including those acting on behalf of Wells Fargo have admitted that they filed bogus documents in hundreds of foreclosure cases filed in state courts. The false and misleading documents filed in the Williams' case include:

    a.  Affidavit pursuant to MD Code Ann. Real Prop. Art. §7-105.1(d) and §14-207(b)(3);

    b.  Allonge to Promissory Note dated June 11, 2004;

    c.  Declaration of Substitute Trustees; and

    d.  Non-Military Service Affidavit.

19.     The information in above paragraph are based on the sworn statements of Xee Moua, China Brown and Herman John Kennerty in the documents submitted to the Circuit Court for Harford County in the Williams' prior foreclosure action.

**B.     Maryland's Response to the Foreclosure Crisis**

20.     In 2007 at the beginning of the crisis, Governor O'Malley convened a task force of representatives to address the crisis that was then underway.   The Maryland Homeownership Preservation Task Force produced a report which aptly summarized the devastating effect of foreclosures on the community as follows:

Foreclosures have a devastating effect on homeowners and the communities in which they live. Frequently, a homeowner who loses his or her home to foreclosure loses the accrued equity. A property sold in a foreclosure sale typically draws a lower price than it would in a regular market sale. In the first half of 2005, Maryland's "foreclosure discount" was 18.8 percent, according to the St. Ambrose Housing Aid Center, Inc. This is a tragedy for a growing number of Maryland families.

Extensive damage is felt in neighborhoods and communities across Maryland. Research shows that with every foreclosure on a single family home, the value of homes within an eighth of a mile declines by about nine-tenths of a percent. Property tax revenues decline proportionally, causing a negative impact on state and local governments. A study of foreclosures in Chicago in 2005 estimated that a single foreclosure costs city government up to $5,000 or more.

Foreclosures also bring with them the potential for more violent crime. Research indicates that for every single percentage point increase in the foreclosure rate in a neighborhood, violent crime in that neighborhood increases by about two percent. Foreclosures can lead to vacant or neglected properties, which create an eyesore and become targets for vandalism. This can tip a community from one dominated by homeowners to one dominated by investors.

Of course, the lending industry and investors also take a hit from rising foreclosure rates. Some major lenders have closed their doors, declared bankruptcy or shuttered their subprime lending arms as a result of the waning demand for risky mortgage products in investor markets. Lenders typically lose $50,000 or more on a single foreclosure, according to information from St. Ambrose Housing Aid Center, Inc. The banking industry cites a figure well over $60,000.

Maryland Homeownership Preservation Task Force Report at 12 (November 29, 2007)

*available at* http://www.gov.state.md.us/documents/HomePreservationReport.pdf

(footnotes omitted).

21.     To reasonably address and avoid some of the negative consequences of foreclosure, the Task Force Report made nine general recommendations that are relevant to the issues before the Court. *See Id.* at 40-43.

22.     In response to the expanding foreclosure crisis and the Task Force Report, the General Assembly introduced and passed several bills during the 2008 legislative session to change Maryland's foreclosure process and curb certain predatory real estate processes. These bills were passed with nearly complete bi-partisan support. As summarized in the General Assembly's 90 Day Report for the 2008 session:

Until [2008], Maryland's foreclosure process, from the first foreclosure filing to final sale, had been among the shortest in the nation. Maryland is a quasi-judicial State, meaning that the authority for a foreclosure sale is derived from the mortgage or deed of trust, but a court has oversight over the foreclosure sale process. Most mortgages or deeds of trust include a "power of sale" (a provision authorizing a foreclosure sale of the property after a default) or an "assent to decree" (a provision declaring an assent to the entry of an order for a foreclosure sale after a default). Under the Maryland Rules, it was not necessary to serve process or hold a hearing prior to a foreclosure sale pursuant to a power of sale or an assent to a decree. Consumer advocates contended that the short timeframes and weak notice provisions in State law seriously limited a homeowner's options to avoid foreclosure by, for example, working out a payment plan with the lender or selling the house. In addition, filing a request for an injunction to stop the sale is expensive, time consuming, and not a realistic option for most homeowners.

***Senate Bill 216 (Ch. 1)/House Bill 365 (Ch. 2)***, emergency legislation that took effect April 4, 2008, make a number of significant changes to the foreclosure process in Maryland for residential real property. "Residential property" is defined under the Acts to mean real property improved by four or fewer single-family dwelling units. Except under specified circumstances, the Acts prohibit the filing of an action to foreclose a mortgage or deed of trust on residential property until the later of 90 days after a default in a condition on which the mortgage or deed of trust states that a sale may be made or 45 days after the notice of intent to foreclose required under the Acts is sent.

. . . .

***Senate Bill 217/House Bill 360*** define "mortgage fraud" as any action by a person made with the intent to defraud that involves:

• knowingly making, using, or facilitating the use of any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that it will be relied upon by a mortgage lender, borrower, or any other party to the lending process;

• receiving any proceeds or any other funds in connection with a mortgage closing that the person knows resulted from the aforementioned actions;

• conspiring to violate either of the preceding provisions; or

• filing or causing to be filed in the land records in the county where a residential real property is located any document relating to a mortgage loan that the person knows to contain a deliberate misstatement, misrepresentation, or omission.

Under the Acts, the "mortgage lending process" includes the solicitation, application, origination, negotiation, servicing, underwriting, signing, closing, and funding of a mortgage loan, as well as the notarizing of any document in connection with a mortgage loan.

Md. Dept. of Legislative Services, The 90 Day Report, A Review of the 2008 Legislative Session, F16-18 (April 11, 2008) *available at* http://mlis.state.md.us/2008rs/90-Day-report/index.htm.

23.     The Maryland Court of Appeals recently adopted in October 2010 an emergency rule to deal with the robo-signing issue based upon the recommendation of the Standing Committee on Rules of Practice and Procedure. Writing for the Committee the Honorable Alan M. Wilner explained:

The need for these changes emanates from recent revelations regarding the filing in residential foreclosure actions of affidavits as to which the affiant either did not have sufficient knowledge of the facts stated in the affidavit to validly attest to their accuracy or did not actually read or personally sign the affidavit. Preliminary audits have shown that hundreds of such affidavits have been filed in Maryland circuit courts. Up to this point, courts, with good reason and really of necessity, have relied on the accuracy of affidavits, especially when filed by attorneys, unless there is something on the face of the document to suggest otherwise or the validity of the affidavit is challenged. Evidence that has recently come to light, largely through admissions under oath by the affiants themselves, has shaken the confidence that the courts have traditionally given to those kinds of affidavits.

In the Committee's view, the use of bogus affidavits to support actions to foreclose liens on property, apart from prejudice to the homeowners, constitutes an assault on the integrity of the judicial process itself.

Letter from A. Wilner to the Court of Appeals, Oct. 15, 2010.

24.     In further response to the foreclosure crisis, Maryland Commissioner of Financial Regulation required for its licensees "a duty of good faith and fair dealing in

9

communications, transactions, and course of dealings with a borrower in connection with the...servicing...of any mortgage loan, including, but not limited to...(3) The duty when servicing mortgage loans to: (a) Promptly provide borrowers with an accurate accounting of the debt owed when borrowers request an accounting; (b) Make borrowers in default aware of loss mitigation options and services offered by the licensee; (c) Provide trained personnel and telephone facilities sufficient to promptly answer and respond to borrower inquiries regarding their mortgage loans; and (d) Pursue loss mitigation when possible." Md. Code Regs. 09.03.06.20.

C.   **Mr. and Mrs. Williams's Mortgage Situation with Wells Fargo**

25.      Unfortunately, like millions of other Americans, Mr. and Mrs. Williams finances were negatively impacted by the economy and the decline in the housing industry, which began to directly impact them in 2008 and 2009. At that time, as a result of a decline in their construction business, the family began to suffer financial difficulties.

26.      On June 11, 2004 Mr. and Mrs. Williams executed a mortgage note with Wells Fargo in the amount of $237,000.00. Between June 11, 2004 and May of 2009, they made timely payments on the note.

27.      A letter from Wells Fargo dated May 24, 2009 advised the Williams that they were in default on their loan, and that payment of $5393.50 by July 8, 2009 was required to cure the default.

28.      On July 7, 2009 the Williams made a payment of $5,202.98.

29.      On August 3, 2009 the Williams made a payment of $2553.86.

30.      On October 18, 2009, Mr. and Mrs. Williams received a letter from Wells Fargo, stating that $5,202.98 was due by December 2, 2009 to pay the mortgage bill for

September and October, 2009, and bring the loan current. Shortly thereafter, the Williams received a payment from one of their customers in the amount of $18,000.00. Unfortunately the customer's check was returned for "insufficient funds". Although the customer later rectified the payment, the bank put a hold on the Williams' account, unbeknownst to them until late November/early December.

31. On October 30, 2009, the Williams made a payment to Wells Fargo by telephone in the amount of $5,202.98 for the mortgage loan, but this payment was reversed back due to the hold on the Williams' account due to their customer's bounced check.

32. On November 12, 2009, the Williams made another payment by telephone in the amount of $2,573.86 to Wells Fargo for their November payment (which included a late fee).

33. On November 16, 2009, the Williams made a payment of $2,669.12 for December (which included a $95.12 late fee).

34.      When Mr. and Mrs. Williams learned that the October 30, 2009 payment of $5,202.98 was not accepted, they immediately mailed a check to Wells Fargo in the same amount. However in early December, the check was returned to them with the explanation that Wells Fargo was pursuing foreclosure and declining to accept the payment.

35.      Wells Fargo also refused to accept similar payments made in November and December of 2009.

36.      On January 6, 2010, Wells Fargo sent the Williams a letter advising that their loan was three months delinquent and that the Williams owed $7,947.36 to bring the loan current. The letter also encouraged the Williams to contact Wells Fargo immediately to

determine eligibility for certain assistance options for individuals suffering financial hardship.

37.     In February of 2010, Mr. and Mrs. Williams received a letter from Covahey Boozer Devan & Dore, stating the amount of $13,307.56 was the amount needed to cure the delinquency. Mr. and Mrs. Williams did not agree with this amount and believed the sum due was actuallyonly two months' mortgage payment (January and February 2010)..

38.     As the Williams did not have the funds to pay the alleged delinquency amount claimed by Covahey Boozer Devan & Dore, they made the first of several modification requests. They received the loan modification application package on or about March 16, 2010.

39.     Wells Fargo sent the Williams a letter on March 18, 2010 stating that their application for a loan modification was received, and requesting additional information, including a hardship explanation and Profit & Loss statements from the Williams' construction business. In reliance on the representations of Wells Fargo that the requested information would complete their application for a modification, the Williams sent all of the updated information on March 29, 2010.

40.     Wells Fargo Senior Vice President Ben Windust sent the Williams a false letter on April 6, 2010 misrepresenting that their request for a modification was denied because Wells Fargo had been unable to reach the Williams to discuss their loan, despite the Williams' submission of all requested information in writing, and numerous attempts to discuss their loan modification by telephone. Mr. Windust's statement was a materially false and misleading statement.

41.      Covahey, Boozer, Devan & Dore sent the Williams another letter, dated May 19, 2010, advising them that their home was to be sold at auction on June 9, 2010 at 11:55 a.m. However, no sale took place because at this point Wells Fargo's improper debt collection practices (discussed herein) became nationally known.

42.      Wells Fargo sent the Williams a letter on June 12, 2010 stating that the loan processing team had received the Williams' documents in application for a Home Affordable Modification Program (HAMP) modification, and requesting that the Williams send in their most recent tax returns and their two most recent Profit & Loss statements. In reliance to Wells Fargo's request the Williams' responded by providing all the information requested to Wells Fargo.

43.      Wells Fargo sent the Williams a materially false letter on July 22, 2010 stating that their HAMP modification application was denied because the Williams failed to provide documentation as requested. This statement was materially false and misleading since the Williams had provided all the information requested. The letter further advised that the Williams had thirty days to contact Wells Fargo to discuss the denial of their application, and that their loan could be referred to foreclosure during that period.

44.      Just one week later on July 29, 2010, Wells Fargo sent the Williams a letter acknowledging the Williams' interest in Wells Fargo's Borrower Counseling Program and advising of certain options that could be available to assist the Williams with their loan, including a loan modification. The notice advised that the Williams had until August 13, 2010 to submit the necessary documents to be considered for repayment assistance.

45.     On or about August 9, 2010 the Williams spoke with a Wells Fargo representative by telephone who advised them that the only documents needed to complete their second loan modification application were Profit & Loss statements for the prior ninety (90) days. In reliance on the representations of Wells Fargo, the Williams timely sent in all requested documents to Wells Fargo on August 16, 2010 by fax to the correct number provided by Wells Fargo.

46.     Wells Fargo also sent the Williams a letter on August 10, 2010 thanking the Williams for contacting them about their loan by telephone, and requesting that the Williams send in financial information related to income and expenses. In reliance on the representations of Wells Fargo, the Williams timely sent in all requested documents to Wells Fargo on August 16, 2010 by fax to the correct number provided by Wells Fargo.

47.     On August 16, 2010, Mr. and Mrs. Williams received a "Special Forbearance Agreement" which stated the terms to begin a loan modification. Mr. and Mrs. Williams were required to make an initial deposit of $4,531.18 and then $1,708.76 for the next three months. In reliance on the representations of Wells Fargo in the Special Forbearance Agreement, Mr. and Mrs. Williams paid the deposit and the monthly payments as agreed, even doubling two of the three monthly payments, sending an extra $1,708.76 for two of the three months. The Agreement stated that Wells Fargo would instruct their foreclosure counsel to stop foreclosure proceedings on the Williams home upon receipt of the initial installment of $4,531.18.

48.     After the three months concluded, the Williams contacted Wells Fargo by telephone on or about November 16, 2010 to determine when Wells Fargo would consider them for a modification. In that communication Wells Fargo advised the

Williams to to continue making the Special Forbearance Agreement monthly payments while they completed the modification process with Wells Fargo.

49.     In reliance on the representations made by Wells Fargo in the Special Forbearance Agreement, the Williams made eleven payments between November 2010 and October 2011 while repeatedly submitting additional financial documentation for the modification process. They had to re-send several of the same documents again and again, as Wells Fargo would falsely and repeatedly say (on April 6, 2010, July 22, 2010, and November 23, 2011) that the documents were never received.

50.     In February, 2011 despite their persistent and numerous attempts, no one from Wells Fargo would communicate with the Williams and they felt that they had no choice but to seek legal counsel. However the attorney that the Williams engaged was unable to secure a modification or any other reasonable arrangement to work out the delinquency. Since the attorney was unable to attain any progress on securing a modification, the Williams dismissed him and once again attempted to obtain a loan modification through Wells Fargo on their own, but they incurred fees for the attorney's services.

51.     Wells Fargo sent the Williams a letter on April 18, 2011 requesting additional information in order to evaluate the Williams' third request for a loan modification, including a financial worksheet, proof of income, profit & loss statements, and a hardship explanation. In addition, the letter requested bank statements for the preceding three months. The letter advised that all documents had to be received by May 3, 2011. In reliance on these representations, the Williams submitted all of the required documents to Wells Fargo on April 21, 2011 by XXX.

52.     On July 7, 2011 Wells Fargo home preservationist Brian Rabadeaux sent the Williams a letter stating that he would be their new primary contact regarding their loan. Mr. Rabadeaux gave his telephone number and extension, and stated that he would answer any questions the Williams had and also requested that if the Williams' had not already done so that they submit additional information to determine eligibility for repayment assistance.  The Williams had already sent all required documents to Wells Fargo and/or Mr. Rabadeaux.

53.     On November 4, 2011 Mr. Rabadeaux sent the Williams a letter stating that he had a new telephone number and advising them that "I suggest you hold onto this letter so you'll have my updated telephone information handy whenever you'd like to speak to me. As always, if you have any questions or concerns, please call me at the above phone number."

54.     On November 23, 2011 Mr. Rabadeaux sent the Williams a letter falsely stating that their request for a loan modification was denied because they had failed to supply Wells Fargo with required documentation in time. This statement by Mr. Rabadeaux was materially false and misleading since the Williams had promptly returned all documents requested by Wells Fargo by every deadline they were given. The letter further advised that the Williams' home was once again in foreclosure, and set for foreclosure sale "within 10 days of the date at the top of this letter," or December 5, 2011.

55.     In December, 2011, Mr. Williams Maryland Home Improvement Commission license was not automatically renewed as it had been on multiple occasions since then. After inquiring of MHIC why his license had not been renewed, Mr. Williams was informed that his license could not be renewed without posting a bond of $20,000, due to

concerns of MHIC over his credit rating, which had been damaged by the improper foreclosure and botch loss mitigation services provided by Wells Fargo on behalf of HSBC. While Mr. Williams was eventually able to resolve the issue with MHIC, he had to do so during normal business hours, and missed three days of work.

56.     On December 6, 2011, Mr. and Mrs. Williams received a letter from Brian Rabadeaux, stating that he was not able to help them find a mortgage assistance solution. Mr. Rabadeaux offered no reason or explanation for this failure. This was a material omission because it did not state what purported documents were allegedly missing, or what other steps the Williams could take to save their home when they had in fact done everything required of them.

57.     After receiving Mr. Rabadeaux's letter of December 6 2011, Mr. and Mrs. Williams telephoned Wells Fargo several times to dispute Mr. Rabadeaux's materially false and misleading claim that they did not comply with the document requests. The Williams noted in the communications that they had sent all requested documents and often sent the same documents numerous times at Wells Fargo's request on behalf of HSBC.

58.     On December 12, 2011 Wells Fargo sent the Williams a letter stating that although they were in active foreclosure, Wells Fargo wanted to help them avoid a foreclosure sale, and in order to do so, the Williams must submit additional information, including monthly gross income, monthly expenses, and a hardship letter. In reliance on the statement that submitting this information would complete their modification application, the Williams faxed in the requested documents that day to Wells Fargo.

59.    In a letter dated December 22, 2011, Wells Fargo returned the Williams' December 2011 payment of $1708.76 and advised that their home was once again in foreclosure status, and that if they wanted to "discuss the present condition of [their] loan, please contact our attorney's office, COVAHEY, BOOZER, DEVAN & [DORE]." This representation was false and misleading since only ten days before Wells Fargo had offered and the Williams had relied upon that offer to again be considered for loss mitigation.

60.    Despite the false representations of Wells Fargo by mail and telephone in December, 2011 that the Williams' home was in foreclosure (when in fact it was not), scheduled for foreclosure sale, and that there were no repayment assistance options available to them, the Williams received a letter from Wells Fargo dated January 3, 2012 stating that they needed to submit the same "additional" information to complete their application for mortgage payment assistance, including monthly gross income, monthly expenses, and a hardship letter. This information was timely submitted in reliance on the representations of Wells Fargo that submitting such documents would finally complete their modification application.

61.    The Williams' re-submitted information was acknowledged by a letter from Wells Fargo only nine days later, on January 12, 2012, stating that their information had been received, but directing the Williams to submit the exact same information again, to wit: monthly gross income, monthly expenses, and a hardship letter. In reliance on the statement that submitting this information would complete their application, the same information was timely submitted a third time.

62.    The Williams' thrice-submitted information was again acknowledged by a letter from Wells Fargo dated January 30, 2012, in which Wells Fargo again acknowledged receipt of recently submitted documents, and also requested (for the third time that month) the Williams' monthly gross income, monthly expenses, and a hardship letter. In reliance on the statement that submitting this information would complete their application, the information was timely submitted a fourth time.

63.    Unsure why Wells Fargo would acknowledge receipt of their submitted documents and then request the exact same documents over and over again, the Williams began to make frequent contact to try and straighten things out. The Williams called Mr. Rabadeaux on February 29, 2012; March 1, 2012; March 2, 2012; March 5, 2012; March 6, 2012 and March 7, 2012. Not one of these calls was answered. Mr. or Mrs. Williams left a voicemail for him each time. These omissions to explain the status of the Williams' loan was materially false and misleading as it denied the Williams the ability to take steps to save their home.

64.    On March 9, 2012, the Williams finally got through to a Wells Fargo employee named "Hilary" who gave the Williams the phone number for Mr. Brian Waterhouse, Mr. Rabadeaux's supervisor. The Williams called Mr. Waterhouse, and after receiving no answer, left a voicemail detailing the reasons they were calling.

65.    On March 13, 2012 Mr. Waterhouse called Mr. and Mrs. Williams back. In that phone call, Mr. Waterhouse informed the Williams that they now had a new representative and supervisor as a point of contact. However, over the next two weeks Mr. and Mrs. Williams' attempts to contact their new Wells Fargo representative on a

daily basis (sometimes numerous times) were unsuccessful. They were again unable to communicate with anyone and no one returned their calls.

66.     On March 15, 2012 Wells Fargo again sent the Williams a letter stating that the Williams must submit the same information they were asked to submit four times between December 12, 2011 and January 30, 2012, including monthly gross income, monthly expenses, and a hardship letter. In reliance of Wells Fargo's e statement that submitting this information would complete their application, the information was timely submitted by the Williams for a fifth time.

67.     On April 20, 2012 the Williams received a fax from Teresa Peterson at Wells Fargo, mistakenly addressed to Mr. and Mrs. William Rogers, requesting the following information:

"1) Feb/March Bank statements for business – all pages with name of bank and your name not the statements off [sic] the internet

2) 4506T  add 2011 on the bottom of the page

3) RMA page 2 – Need to fill in the middle column and total (attached)

4) Need 1120's and K1's for both companies

5) Need 2011 P&L's for both companies Jan-Dec

6) Need 2012 P&L's for both companies Jan – Mar.

7) Need 2011 Tax Returns for Businesses and personal."

68.     Exasperated with Wells Fargo's unresponsiveness, repetitive document requests and conflicting accounting of their loan, Mr. and Mrs. Williams reached out to Senator Barbara Mikulski's office for help in late March, 2012. Shortly thereafter, they were contacted again by Teresa Peterson, who assured the Williams that she would personally

see that the Williams received a modification on behalf of Mikulski's office and that she was their new point of contact at Wells Fargo. They began the application process for the loan modification for the sixth time, supplying all requested documentation as they had five times before over the previous two years to Wells Fargo through Teresa Peterson.

69.     On May 30, 2012 Wells Fargo sent the Williams a letter stating that their application for a loan modification was denied because the investor that owns the Williams' loan (HSBC) declined the request to modify the mortgage. The letter also gave advice on how the Williams could sell their home. Upon information and belief this statement was materially false and misleading because as a practice Wells Fargo never requested HSBC to make the necessary inquiries on the Williams' modification requests.

70.     On June 4, 2012 Teresa Peterson from Wells Fargo sent the Williams a letter stating that the Williams' inquiries regarding loan modifications with Wells Fargo Home Mortgage were closed, and generally detailing the Williams' previous attempts to secure a loan modification.

71.     Compounding matters for Mr. and Mrs. Williams, Mr. Williams became ill and had to seek treatment for high blood pressure including new prescriptions for lovastatin and losartan, which was necessary as a result of the stress caused by Wells Fargo. Before the unfair and deceptive communications with Wells Fargo concerning the threatened foreclosure and botched loss mitigation efforts detailed above, Mr. and Mrs. Williams did not have any high blood pressure problems.

E.     **The Bogus Foreclosure Collection Actions**

72.     As part of its bogus, unfair, and deceptive collection practices, Wells Fargo Home Equity Trust 2004-2 allegedly appointed certain trustees from the firm of Covahey,

Boozer, Devan & Dore on or about June 11, 2004. This appointment was recorded in the land records for Harford County at Book 5472, Page 476.

73.     Mr. and Mrs. Williams believe the appointment was bogus because it was purportedly signed by China Brown, Vice President of Loan Documentation for the Wells Fargo Home Equity Trust 2004-2.

74.     According to public filings in related litigation, China Brown robo-signed countless document in her capacity as Vice President of Loan Documentation for Wells Fargo.

75.     Without either a legitimate signature and/or testimony of Ms. Brown, Ms. Moua, or Mr. Kennerty, Wells Fargo and HSBC had no right to file and pursue the foreclosure action in the manner each chose to do so through its appointed agents against the Williams.

76.     The practices of the Defendants complained of by Mr. and Mrs. Williams against Wells Fargo and HSPC have been subject to numerous public investigations and findings that such actions are among other things "unsafe and unsound" banking practices. Because of these admissions and consent agreements, neither Wells Fargo nor HSBC may deny that certain practices subject to this action were done without knowledge that the practice was unfair, deceptive, improper, unsafe, or unsound in the course of their relationships with Mr. & Mrs. Williams. These public investigations include:

   a.  On April 13, 2011 Wells Fargo entered into a Consent Order with the Comptroller of the Currency of the United States of America and the Office of the Comptroller of the Currency ("OCC") in which "[t]he OCC identified certain deficiencies and unsafe or unsound practices in residential mortgage servicing and in the Bank's

initiation and handling of foreclosure proceedings." *See* Wells Fargo Consent
Order at Page 1 found at http://www.occ.gov/news-issuances/news-
releases/2011/nr-occ-2011-47k.pdf.

b. On April 13, 2011 HSBC entered into a Consent Order with the Comptroller of
   the Currency of the United States of America and the Office of the Comptroller of
   the Currency ("OCC") in which "[t]he OCC identified certain deficiencies and
   unsafe or unsound practices in residential mortgage servicing and in the Bank's
   initiation and handling of foreclosure proceedings." *See* HSBC Consent Order at
   Page 1 found at http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-
   2011-47d.pdf.

c. On April 4, 2012, Wells Fargo entered into a Consent Judgment with 49 state
   attorney generals (including the Attorney General for the State of Maryland) and
   the United States of America for the purpose of "address[ing] mortgage loan
   servicing and foreclosure abuses"[1] of Wells Fargo.  See Wells Fargo Consent
   Judgment at https://d9klfgibkcquc.cloudfront.net/Consent_Judgment_WellsFargo-
   4-11-12.pdf.

d. On January 7, 2013, Wells Fargo reached an agreement in principle with the
   Office of the Comptroller of the Currency (OCC) and the Federal Reserve Board
   to pay more than $8.5 billion in cash payments and other assistance to help
   borrowers, like Mr. & Mrs. Williams, who were subject to its improper practices.

---

[1] Quote from USDOJ Press Release at https://d9klfgibkcquc.cloudfront.net/Settlement-USDOJ-
FILING-news-release.pdf.

See http://www.occ.gov/topics/consumer-protection/foreclosure-

prevention/correcting-foreclosure-practices.html for more details.

77.     Having nowhere else to turn for help, Mr. and Mrs. Williams are left to seek this

Court's help in preventing the injustice perpetrated by Wells Fargo and HSBC of

illegally, unfairly and deceptively foreclosing on the Williams' home. These acts have

damaged Mr. & Mrs. Williams by:

     a.      Forcing them in incurred legal fees in an attempt to escalate and mitigate

the ongoing situation without the need for litigation;

     b.      added fees and costs associated with their mortgage account based on the

bogus and otherwise improper foreclosure and collection activities as well as late

fees and charges when the loan was actually current;

     c.      damage to their credit through the public reporting of foreclosure

collection actions filed in a  manner which Wells Fargo and HSBC had no right to

pursue in the manner it elected to pursue;

     d.      lost time from work trying to responsibly obtain a modification;

     e.      emotional damages from stress, sleeplessness, anxiety, fear and medical

issues that have occurred because of the direct and indirect actions (through their

appointed agents) of Wells Fargo and HSBC.

**COUNT I -- VIOLATION OF THE MARYLAND CONSUMER
DEBT COLLECTION ACT,
MD CODE, COMM. LAW, § 14-201 *et seq.*
*(Against All Defendants)***

78.     Mr. and Mrs. Williams reiterates and incorporates every allegation above as if set forth herein in full and add:

79.     By threatening and proceeding with the intent to foreclose based upon practices described above, Wells Fargo, HSBC and Wells Fargo Home Equity Trust 2004-2 have acted as collectors as that term is defined by § 14-201(b) of MD. CODE, COMM. LAW.

80.     Mr. and Mrs. Williams are persons as defined by § 14-201(d) of MD. CODE, COMM. LAW.

81.     The underlying mortgage transaction and threats of foreclosure as a means towards debt collection related to this complaint constitute "consumer transactions" as defined by § 14-201(c) of MD. CODE, COMM. LAW.

82.     Wells Fargo, HSBC and Wells Fargo Home Equity Trust 2004-2 have claimed, attempted, or threatened to enforce a collection right with knowledge that the right asserted did not exist in the form pursued under Maryland or Federal law and procedures.

83.     Mr. and Mrs. Williams' damages as alleged herein were proximately caused by Wells Fargo's actions including damages for emotional distress or mental anguish suffered with or without accompanying physical injury as well as those damages described in ¶¶ 4, 5, 71 & 77 above.

84. HSBC as the principal of for Wells Fargo is liable for the acts of its authorized agents.

WHEREFORE, Mr. and Mrs. Williams pray for the following relief against Wells Fargo and HSBC for their violations of the Maryland Consumer Debt Collection Act:

    A.  A money judgment of all damages caused by Wells Fargo's and HSBC's actions, directly or indirectly, in the sum of $100,000 to each Plaintiff;

    B.  Their costs including attorneys' fees as well as pre- and post-judgment interest;

C.  Such other and further relief as the nature of their cause may require.

## COUNT II – VIOLATION OF MARYLAND'S CONSUMER PROTECTION ACT, MD. CODE ANN. COM. LAW § 13-101 *et. seq.*

85.  Mr. and Mrs. Williams reiterate and incorporate every allegation above as if set forth herein in full and add:

86.  The mortgage loan transactions and foreclosure practices as set forth herein of the Defendant against the Plaintiffs are governed by the Consumer Protection Act, MD. CODE ANN. COM. LAW § 13-101 *et. seq.*

87.  Section 13-303 prohibits unfair or deceptive trade practices in the extension of consumer credit or collection of consumer debts.  The consideration of a loan modification and threat of a foreclosure action involves both the extension of credit and the collection of debts.  Section 13-316 requires servicers like Wells Fargo to respond to inquiries from consumers within 15 days.

88.  The Maryland Consumer Protection Act defines unfair or deceptive trade practices to include, inter alia, the following: (a) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers; and (b) Failure to state a material fact if the failure deceives or tends to deceive.

89.  By engaging in the acts and omissions set forth above, by making the misrepresentations set forth above, and by failing to disclose material facts where the failure to do so deceived or tended to deceive, the Defendants has committed unlawful or deceptive trade practices in violation of the Maryland Consumer Protection Act.  Sec. 13-301(1) and (3) and Sec. 13-303(4) ("MCPA").

90.     HSBC is also liable for the acts of its authorized agent/servicers, including Wells Fargo, on its behalf in dealing with Mr. and Mrs. Williams.

91.     The Defendants' conduct, as set forth above, had the capacity, tendency or effect of deceiving Mr. and Mrs. Williams who in fact was deceived or misled, causing injury and loss through the unfair or deceptive prosecution, based upon incomplete and bogus responses to their requests for modifications of their loans, or threat of prosecution of a foreclosure action by Defendants directly and indirectly

92.     Mr. and Mrs. Williams' damages as alleged herein were proximately caused by Wells Fargo's actions including damages for emotional distress or mental anguish suffered with or without accompanying physical injury as well as those damages described in ¶¶ 4, 5, 71 & 77 above.

93. The Defendants' violations of the MCDCA are per se violations of the MCPA.

WHEREFORE, Mr. and Mrs. Williams prays for the following relief against Wells Fargo for their violations of the Maryland Consumer Protection Act:

A.  They be awarded as part of this claim a sum of no less than $100,000 to each Plaintiff which represents their compensatory damages as a result of the Defendants' direct and indirect, unfair or deceptive practices as described herein including the Defendant's failure to comply with federal and state law;

B.  They be awarded their reasonable attorney's fees and costs; and

C.  That their claim should include such other and further relief as the Court deems just and proper.

**COUNT III – MARYLAND MORTGAGE FRAUD PROTECTION ACT, MD. ANN. CODE, REAL PROP. § 7-401 MD. REAL PROP., *et seq.***

92. .    Mr. and Mrs. Williams reiterates and incorporates every allegation above as if set forth herein in full and add:

95. 93. The Maryland Mortgage Fraud Protection Act, Md. Ann. Code, Real Prop. § 7-401 MD. REAL PROP., *et seq.* ("MMFPA") governs the relationship between the Defendants and Plaintiffs.94. MD ANN. CODE., REAL PROP. § 7-401 (c) provides: "Homeowner" means a record owner of residential real property. The Plaintiffs are record owners of the residential property in question and therefore are Homeowners. MD ANN. CODE., REAL PROP. § 7-401 (e) provides "Mortgage lending process…includes [t]he…servicing…of a mortgage loan."

96. MD ANN. CODE., FINANCIAL INSTITUTIONS CODE. § 11-501 (k)(1) provides: "Mortgage loan" means any loan or other extension of credit that is: (i) Secured, in whole or in part, by any interest in residential real property in Maryland; and (ii) If for personal, household or family purposes, in any amount."

97. The MMFPA works to protect the interests of all parties to mortgage issues in Maryland from misstatements, misrepresentations and omissions; in this instance the MMFPA works to protect borrowers like Mr. and Mrs. Williams from mortgage companies like the Defendants and ensure a level, fair playing field between all borrowers and professionals.

98. Mr. and Mrs. Williams are homeowners in the Mortgage Lending Process as defined by the MMFPA since the actions in dispute in this lawsuit involve the servicing of their residential mortgage loan as well as the  foreclosure action

or threat of foreclosure which is an attempt to collect a certain sum on the

mortgage transaction.

99. Md Ann. Code., Real Prop. § 7-401 (d) provides:

"Mortgage fraud" means any action by a person made with the intent to defraud

that involves:

1. Knowingly making any deliberate misstatement, misrepresentation or omission during the mortgage lending process with the intent that the misstatement, misrepresentation or omission be relied on by a mortgage lender, borrower or any other party to the mortgage lending process;

2. Knowingly using or facilitating the use of any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process.

3. Receiving any proceeds or any other funds in connection with a mortgage closing that the person knows resulted from a violation of item (1) or (2) of this section;

4. Conspiring to violate any provisions of item of (1), (2) or (3) of this section...

100. The Defendants have committed Mortgage Fraud by:

i. Knowingly making, as described herein, deliberate misstatements, misrepresentations and omissions during the mortgage lending process, including failing to respond to the Plaintiff's requests for a modification or change of their mortgage loans, with the intent that the misstatements, misrepresentations and omission be relied on by the Plaintiff and the general public;

ii. Knowingly using or facilitating, as described herein, the use of any deliberate misstatements, misrepresentations, and omissions during the mortgage lending process, including the state court foreclosure actions it

has commenced and carried out, with the intent that the misstatements, misrepresentations, and omissions be relied on by the Plaintiff.

101.    Mr. and Mrs. Williams has been damaged by the Defendants' deliberate misstatements, misrepresentations, and omissions during the mortgage lending process as stated in ¶¶ 4, 5, 71 & 77 above.

WHEREFORE, Mr. and Mrs. Williams request the following on their behalf based upon the Defendants' violations of the MMFPA:

A.  They be awarded as part of their claim the sum of no less than $100,000 for each Plaintiff which represents  her compensatory damages as a result of the Defendants' illegal practices and misrepresentations as described in ¶¶ 4, 5, 71 & 77 above;

B.  The Plaintiffs be awarded three times their actual damages for the Defendant's willful and knowing violations;

C.  They be awarded as part of the claim their reasonable attorney's fees and costs; and

D.  That their claim should include such other and further relief as the Court deems just and proper.

Respectfully Submitted,

Phillip R. Robinson
Legg Law Firm, LLC
5500 Buckeystown Pike
Frederick, MD 21703
(301) 620-1016
Attorney for Plaintiff

## REQUEST FOR A JURY TRIAL

Plaintiff requests a jury trial on all claims asserted herein.

_____
Phillip Robinson